1  Matthew J. Jacobs (CA SBN 171149)
     mjacobs@velaw.com
2  Francis M. Yang (CA SBN 313984)
     fyang@velaw.com
3  VINSON & ELKINS LLP
   555 Mission Street, Suite 2000
4  San Francisco, CA  94105
   Telephone: +1.415.979.6900
5  Fax: +1.415.651.8786

6  Attorneys for Defendant
   JOHN GERINGER

7

8

9              UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                   SAN JOSE DIVISION

12 | UNITED STATES OF AMERICA,            | Case No.: CR 12-00888-EJD
13 |                         Plaintiff,   | **SUPPLEMENTAL BRIEFING REGARDING PATENT VALUATION**
14 |        v.                            |
15 | JOHN GERINGER, CHRISTOPHER LUCK, and KEITH RODE, |
16 |                         Defendants.  |

---

SUPPLEMENTAL BRIEFING REGARDING PATENT VALUATION         CASE NO.: CR 12-00888-EJD
US 5938517V.2

On October 3–5, 2018, the Court heard testimony regarding the value of Digital Delivery Networks, Inc. ("DDNi"), a software company that the GLR Growth Fund had a substantial interest in as of the measurement date, May 23, 2012.  After hearing testimony and closing arguments, the Court asked for supplemental briefing from both experts regarding the '812 patent's value.  PwC provided its supplemental report (the "PwC Second Supplemental Report") valuing the '812 patent on October 26, 2018, and EY provided its supplemental report (the "EY Supplemental Report") valuing the '812 patent on November 1, 2018.

We now respectfully submit this supplemental briefing regarding patent valuation because the EY report contains serious, misleading flaws.

I.   **EY Again Incorrectly Applies the Market Approach.**

Dr. Miller again misapplies the market approach in the EY Supplemental Report.  In the first EY Report (the "EY Report"), Dr. Miller misapplied the guideline public company method by failing to identify comparable guideline companies.  Although she acknowledged that a guideline company multiple must be "evaluated and adjusted based on the strengths and weaknesses of the subject company,"[1] she compared DDNi to 10 "publicly traded U.S. software companies" without describing how the guideline companies are similar to DDNi.[2]  Indeed, she stated in her report and in her testimony that she was unable to find directly comparable companies and instead used a "wide array" of publicly traded U.S. software companies.[3]  The guideline company method cannot be based on a "wide array" of companies.

In the EY Supplemental Report, Dr. Miller makes the same mistake.  She states that she considered "guideline transaction data on patent sales."[4]  She bases her analysis on datasets of average purchase prices per patent without any explanation how these patents are similar to the '812 patent.[5]  These datasets appear to capture average patent prices across the United States.  A patent

---

[1] EY Report at 12.

[2] EY Report at 38.

[3] *Id.*

[4] EY Supplemental Report at 13.

[5] *Id.*

1

can cover nearly anything from an improved way to make a plastic bag to a method for genetically modifying a plant.  The other patents in the datasets may be monetized in ways completely different from the '812 patent—it is difficult to know because Dr. Miller provides no analysis on these other patents.  To use an analogy, Dr. Miller's methodology would value a house in the Bay Area using median house prices in the United States.  Therefore, Dr. Miller's market approach to valuing the '812 patent is flawed and unreliable.

**II.     EY's Income Approach Adds Unwarranted Discounts that Severely Undervalue the '812 Patent.**

At first blush, Dr. Miller's income approach resembles Mr. Branch's.  However, she applies multiple, unsupported and unwarranted discounts that severely undervalue the patent.

Most notably, her royalty rate calculation is seriously flawed because she adds additional, misleading discounts that discount the patent's value by over 98%, leaving a less-than 2% royalty rate.  For reference, Mr. Branch uses the 35% revenue sharing rate discussed in the contemporaneous negotiations with Samsung and Acer to estimate the royalty rate for his model.  Dr. Miller includes this revenue sharing component but also adds two additional discounts of 17% and 20% which she multiplies together with the 35% discount to reach a royalty rate of less than 2% without methodological support.[6]

The first additional discount, a 17% discount that is derived from the gross margin of Symantec,[7] is flawed in three ways.  First, Symantec and other antivirus software were not the only items that an OEM could provide on a '812 patent platform.  For example, DDNi's platform also provided Microsoft Office and gaming applications, among other software.  Thus, it is unclear why Symantec is singled out as the basis for this discount.  Second, the royalty rate should be based on gross revenues rather than gross margin as discussed in the contemporaneous contract negotiations with Samsung and Acer.  Gross margin is distinct from gross revenue.  Gross revenue is the amount of total sales prior to deductions.  Gross margin is the percentage of gross revenue that a company

---

[6] *See* EY Supplemental Report at Exhibit C1 (multiplying 17% by 35% by 20% to reach a royalty rate of 1.2%).

[7] EY Supplemental Report at 21.

keeps after deducting cost of sales.  Dr. Miller even admits that gross revenue is the correct measure in her own royalty rate heading: "Royalty rate as a percentage of gross revenues per infringing PC."  Yet, she now references the gross margins of a company unrelated to revenues for the '812 patent in her calculations.  Third, the gross margins of Symantec have nothing to do with the amount of money that the '812 patent holder would receive in royalty revenue.  To illustrate, Symantec's gross margin of 83% means it keeps 83 cents for each dollar in revenue.  Symantec reported revenue of $6.73 billion for the fiscal year of 2012.[8]  Its gross margin of roughly $5.5 billion bears no relation to the royalty rate *percentage* that the '812 patent holder would receive in either litigation or through a licensing deal with Symantec or another company.  Dr. Miller states that the 17% left over is the percentage of revenue paid to OEMs, 17% of Symantec's revenue in 2012 is over $1 billion, far more than even Mr. Branch projected is paid to OEMs.  Therefore, this 17% discount for Symantec's gross margin is completely illogical.

The second additional discount, a 20-30% discount that Dr. Miller calls a license fee,[9] is also flawed.  Dr. Miller provides no empirical basis for this discount.  She states that the DRM service platform vendor would need to pay a license fee to the patent holder.  A DRM server platform vendor is a company like DDNi.  Dr. Miller is focusing on the wrong entity.  The '812 patent holder could seek patent enforcement or a licensing deal with the OEMs themselves—as DDNi was in the process of doing with Acer and Samsung and already had in place with Lenovo and Sony—rather than another company that provides a similar platform.  Thus, no license fee should be included.  Furthermore, even if a license fee were warranted, it should be a cost that is subtracted rather than a multiplicative percentage discount.  Therefore, this license fee is unwarranted.

Again, it is important to note that these extra discounts are not only unwarranted, they are improperly multiplied together—multiplying the percentages (17% x 35% x 20%) together creates a very small royalty rate of less than 2%.[10]  Dr. Miller fails to provide adequate support for why the

---

[8] Symantec Press Release, available at http://investor.symantec.com/About/Investors/press-releases/press-release-details/2012/Symantec-Reports-Fourth-Quarter-And-Fiscal-Year-2012-Results/default.aspx.

[9] EY Supplemental Report at 22.

[10] *See id.*

extra 17% and 20% discounts are taken and why they are multiplied together with the 35% revenue sharing rate contained in the draft contracts.

The EY Supplemental Report also includes enforceability discounts of 50%, 75%, and 90% that are wholly unsupported by any empirical data. Dr. Miller likens her enforceability discount to Mr. Branch's marketability discount, but they are distinct. Mr. Branch applied a marketability discount due to the illiquidity of the subject asset.[11] It was estimated based on the *Mandelbaum* factors and an empirical valuation study.[12] By contrast, Dr. Miller's enforceability discount is based on her unsupported legal opinion that the patent may not be enforceable.[13] For example, she states that "The widespread use of DRM by companies such as Microsoft, Adobe and Symantec during this period argues for the potential existence of prior art."[14] This is a legal conclusion, and as a non-lawyer, Dr. Miller is not qualified to provide this opinion. Furthermore, she fails to provide any empirical support for her statements about DRM software usage. Risk of not achieving cash flows are included in a discount rate (which she also includes in her model). Dr. Miller provides no explanation or support for the additional enforceability discount. And, Dr. Miller provides no explanation or support for why she uses 50%, 75%, and 90% in particular as her enforceability discounts.

Taking these issues as a whole, it is again clear that Dr. Miller began with the answer and worked her way backwards. As discussed above, she applies multiple discounts in a way that exponentially reduces her valuation conclusion to a *de minimus* value to remain consistent with her earlier report. Many of these discounts are not based on any empirical data and lack methodological support. Consequently, Dr. Miller's income approach valuing the patent's value is unreliable.

//

//

---

[11] *See* PwC Report at 35 – 36, Exhibit 3 Schedule D (explaining the marketability discount).

[12] *Id.*

[13] *See* EY Supplemental Report at 24.

[14] *Id.*

### III.  PwC's Income Approach Is Supported by Contemporaneous Evidence and Empirical Data.

In contrast to Dr. Miller's methodology, Mr. Branch built his model on the evidence in this case, empirical data, and proven methodology. He began with a presumption that the patent was enforceable based on contemporaneous legal opinions from two law firms, Mount, Spelman, and Fingerman, P.C. and the Intellectual Property Venture Group.[15] His model applied a commonly used waterfall approach where he identified the addressable market and then applied a royalty rate.[16] He defined his addressable market using empirical data that estimated the amount of PCs shipped in the United States with preinstalled software using a DRM solution.[17] He determined the revenue per PC using contemporaneous projections created by Rene North, the company's CFO, as of the measurement date.[18] To reach the total revenue, he applied the royalty rate of 35% taken from the Acer and Samsung draft contracts that memorializes contemporaneous negotiations with those companies.[19]

Mr. Branch acknowledges that a successful patent enforcement or licensing campaign would be expensive, so he included significant additional patent enforcement costs of nearly $5 million per year.[20] He also acknowledges that revenues of this magnitude are risky, and the risk of not achieving those cash flows is accounted for in his 33% discount rate which he estimated using empirical data.[21] This discount rate compounds each year from the measurement date, meaning revenues in 2017 are discounted by 80%. Finally, he included a marketability discount of 30% to account for the illiquidity of the patent.[22]

---

[15] PwC Second Supplemental Report at 3.

[16] *See id.* at Exhibit 1B Schedule B-3.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* at Exhibit 1B Schedule B-1.

[21] *Id.* at Exhibit 1B Schedule C.

[22] *Id.* at Exhibit 1B Schedule D.

(Footnote Cont'd on Following Page)

Mr. Branch concluded that the value of the patent is $37,555,000, and the GLR ownership share of 55% is $20,720,000.[23]

Each step of Mr. Branch's analysis was supported by empirical data, evidence, or proven methodology. Given the serious issues with the EY Supplemental Report, we submit to the Court that the only reasonable option is to rely on Mr. Branch's calculations.

                                      Respectfully submitted,

                                      VINSON & ELKINS LLP

Dated: November 14, 2018                    By:  */s/ Matthew J. Jacobs*
                                                                    Matthew J. Jacobs
                                                                    Attorneys for Defendant
                                                                    JOHN GERINGER

---

[23] *See* PwC Second Supplemental Report at Exhibit 1B.

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 14, 2018, the foregoing document was electronically filed with the Clerk of the Court for the UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, using Court's Electronic Case Filing (ECF) system. The ECF system routinely sends a "Notice of Electronic Filing" to all attorneys of record who have consented to accept this notice as service of this document by electronic means.

Dated: November 14, 2018

By: */s/ Matthew J. Jacobs*

Matthew J. Jacobs

Attorneys for Defendant

JOHN GERINGER