DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    FAX: (408) 535-5066
    Jeffrey.b.schenk@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR-12-00888-EJD |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | Sentencing Date: April 9, 2019 |
| JOHN GERINGER, | Time: 9:00 AM |
| Defendant. | Court: Hon. Edward J. Davila |

RE-SENTENCING MEMORANDUM
12-00888 EJD                        I

# TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDUAL HISTORY ...................................................................1
II. OFFENSE CONDUCT ........................................................................................................1
III. LOSS CALCULATION ........................................................................................................3
IV. GUIDELINES CALCULATION ...........................................................................................5
    A. Loss Calculation.................................................................................................6
    B. Number of Victims ............................................................................................7
    C. Violation of Securities Laws..............................................................................8
    D. Substantial Assistance .......................................................................................8
V. SENTENCING RECOMMENDATION ................................................................................8
    A. 3553(a) Factors ..................................................................................................9
    B. Restitution........................................................................................................10
    C. Forfeiture..........................................................................................................10

# TABLE OF AUTHORITIES

## Federal Cases

*Honeycutt v United States*, __ U.S., __, 137 S.Ct. 1626 (2017) ............................................................. 11

*Leonard*, 529 F.3d 83 (9th Cir. 2008) ............................................................................................................ 1

*S.E.C. v. Metter*, 706 Fed App'x 699 (2d Cir. 2017) ................................................................................ 11

*United States v. Bangiyev*, __ F.Supp.3d __, 2019 WL 645050 (E.D.Va. Feb. 14, 2019) ................ 11, 12

*United States v. Booker*, 125 S.Ct. 738 (2005) ............................................................................................ 5

*United States v. Bright*, 353 F.3d 1114 (9th Cir. 2004) .......................................................................... 11

*United States v. Brock-Davis*, 504 F.3d 991 (9th Cir. 2007) ................................................................. 10

*United States v. Cacho-Bonilla*, 404 F.3d 84 (1st Cir. 2005) ................................................................. 11

*United States v. Ferguson*, 385 F. App'x 518 (6th Cir. 2010) ................................................................ 10

*United States v. Garcia-Guizar*, 160 F.3d 511 (9th Cir. 1998) .............................................................. 10

*United States v. Geringer*, 672 Fed.Appx. 651 (9th Cir. 2016) ............................................................ 1, 4

*United States v. Milo*, 506 F.3d 71 (1st Cir. 2007) ................................................................................. 11

*United States v. Newman*, 659 F.3d 1235 (9th Cir. 2011) ..................................................................... 11

*United States v. Pescatore*, 637 F.3d 128 (2d Cir. 2011) ....................................................................... 11

*United States v. Petrie*, 302 F.3d 1280 (11th Cir. 2002) ........................................................................ 11

*United States v. Reed*, 80 F.3d 1419 (9th Cir. 1996) ............................................................................. 10

*United States v. Riley*, 335 F.3d 919 (9th Cir. 2003) ............................................................................... 7

*United States v. Shakur*, 691 F.3d 979 (8th Cir. 2012) ......................................................................... 10

*United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010) ...................................................................... 7

United States v. Ward, 2017 WL 4051753 ................................................................................................ 11

United States v.W.Coast Aluminum Heat Treating Co., 265 F.3d986,992 (9th cir.2001) ........................ 1

Federal Statutes

18 U.S.C. § 981(a)(1)(C) .................................................................................................. 10

28 U.S.C. § 2461(c) ........................................................................................................... 10

Federal Rules

Federal Rule of Criminal Procedure 32.2(b)(4) ................................................................ 10

U.S.S.G. ( 2B1.1(b)(1)(L) .................................................................................................... 5

U.S.S.G. ( 2B1.1(b)(2)(B) .................................................................................................... 6

U.S.S.G. § 1B1.3 .................................................................................................................. 7

U.S.S.G. § 5K1.1 .................................................................................................................. 6

USSG § 2B1.1 ................................................................................................................. 4, 6

USSG § 2B1.1(b)(1) ............................................................................................................. 3

## I. INTRODUCTION AND PROCEDURAL HISTORY

The defendant, John Geringer, is scheduled to be re-sentenced on April 9, 2019. In June 2014, Geringer pleaded guilty to Counts One, Two, and Twenty-Seven of the Indictment. (Criminal Docket "Dkt." 82.) Those counts charged him with Conspiracy to Commit Mail and Wire Fraud (Count One), Mail Fraud (Count Two), and Securities Fraud (Count Twenty-Seven). (Dkt. 1.) On June 25, 2015, this Court held a sentencing hearing. (Dkt. 172.) The Court sentenced the defendant to a below-U.S. Sentencing Guidelines ("USSG") sentence of 145 months of imprisonment. (Dkt. 173, 187.) Following an appeal to the Ninth Circuit Court of Appeals, this matter now appears before this Court for re-sentencing. (Dkt. 243.)

In advance of this re-sentencing hearing, the United States hereby files this Memorandum to address the proper calculation of the loss amount under § 2B1.1 of the USSG, as well as to advise the Court of its sentencing recommendation. In remanding this case to the District Court, the Ninth Circuit found:

> A victim's loss should be offset by a victim's benefit for the purpose of calculating loss under the Sentencing Guidelines. *See United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 992 (9th Cir. 2001). Under this principle, the district court was obligated to determine the actual value, if any, of the fund, and to deduct that value from the loss amount. *See United States v. Leonard*, 529 F.3d 83, 93 (9th Cir. 2008) (holding that the district court erred by failing to determine and deduct the actual value of securities received by fraud victims).

*United States v. Geringer*, 672 Fed.Appx. 651 (9th Cir. 2016). Therefore, this Memorandum will focus on the proper calculation of loss amount under § 2B1.1 of the USSG.

## II. OFFENSE CONDUCT

This Court is familiar with the facts of this case. In addition to presiding over the three guilty pleas by the defendants in this case, the Court presided over three sentencing hearings, including co-defendant Christopher Luck's two-day sentencing hearing. Should the Court wish to reacquaint itself with specific facts, the United States refers the Court to the United States' Sentencing Memorandum filed in advance of Christopher Luck's January 2015 sentencing hearing. Dkt. 117. Therefore, here, as

RE-SENTENCING MEMORANDUM
12-00888 EJD 1

it did in its original Sentencing Memorandum, the government will limit its factual discussion to facts relating to John Geringer's role in this fraud. Dkt. 162.

John Geringer was the architect of this fraud. Geringer admitted, both in 2009 to the FBI and through his guilty plea, to defrauding his investors and his partners/co-defendants (Luck and Rode) by diverting investor funds to private companies, inflating his earnings from equity trades, initially hiding this information from Luck and Rode, and continuing to hide this information from the investors. After Geringer admitted his fraudulent conduct to Luck and Rode in 2009, Luck and Rode knowingly joined the conspiracy to defraud GLR's investors.

The GLR Growth Fund ("Fund") was formed in 2003, and was the only investment fund managed by GLR. GLR had three General Partners (Geringer, Luck, and Rode) and many Limited Partners (the victim investors). Prior to 2008, the Fund invested in a combination of stocks and private company investments. However, after 2008, according to Geringer, following major liquidations by some significant investors, the Fund exclusively invested in private companies, including MediaTile and Digital Delivery Networks, Inc. ("DDNI"). Both MediaTile and DDNI were located in Scotts Valley. Luck and Rode served on the Board of Directors for MediaTile and DDNI. Neither MediaTile nor DDNI made any payments to the Fund, although the Fund was the largest shareholder in each company. Geringer had hoped to sell MediaTile and DDNI for substantial profits, and make the victims whole. That never happened. Instead, on August 6, 2012, Corum Digital Corporation purchased MediaTile for $786,354.80. Dkt 78 of 12-CV-02663-LHK (the SEC v. GLR matter). In January 2017, DDNI filed for bankruptcy. *See* Expert Report of Dr. Amanda Miller at 14.

This fraud came to end in 2012. First, the FBI interviewed Geringer twice in March 2012. Initially, on March 9, 2012, Geringer falsely claimed that all or most of GLR's new investors were fully aware that the Fund was exclusively investing in two private companies, and that Geringer no longer actively traded stocks. Also, Geringer falsely claimed that he and his partners were always honest with their investors. Geringer claimed never to have misrepresented facts to investors. Geringer believed that investment materials provided him with broad discretion to select appropriate investment vehicles.

Finally, Geringer falsely claimed that investigators would not be able to find investors who believed that their money was any place but exclusively with private companies.

Five days later, on March 14, 2012, Geringer had a follow-up interview with the FBI. The FBI questioned Gerigner about documents that were recovered during the search of GLR's offices. In particular, the FBI asked Gerigner about a document Gerigner wrote, signed, and dated on April 23, 2009. In this document, Geringer confessed that he "falsified trading statements, reports (both written and verbal) and trades to the GLR Growth Fund, L.P. and GLR Capital Management, LLC." Geringer also stated in this written confession that Chris Luck and Keith Rode had no knowledge of Geringer's fraudulent activities. During the second FBI interview, Geringer reviewed this document, and admitted that he created and signed the document in 2009. During this March 14, 2012 interview with the FBI and since then, Geringer has consistently admitted his role in this fraud.

The impact this fraud had on the scores of victims is as varied as the victims themselves. In story after story, victims were persuaded to invest in GLR because they were told that Geringer would be an active trader who monitored and traded daily. Nearly every victim has stated that he or she invested because they valued the Fund's allegedly diversified portfolio. These victims believed the Fund was profitable, because of the statements Geringer or Luck personally made to them, as well as by relying on misrepresentations contained in the account statements that were mailed to them.

### III. LOSS CALCULATION

USSG § 2B1.1(b)(1) and Application Note 3 provide guidance on calculating this fraud's applicable loss amount. Application Note 3(A)(1) informs us that we should use "actual loss" or the reasonably foreseeable pecuniary harm that resulted from the offense. In this case, the GLR Growth Fund accepted investor funds between 2003 and 2012. John Geringer, since he made knowingly false statements during the entire fraud scheme, should be held responsible for the entire fraud scheme loss amount (for USSG purposes), forfeiture, and restitution. Chris Luck and Keith Rode, on the other hand, discovered the fraud around May 1, 2009. Therefore, at their sentencings, Luck and Rode were held responsible by this Court for all investor losses incurred post-May 1, 2009.

RE-SENTENCING MEMORANDUM
12-00888 EJD                3

In Geringer's prior sentencing hearing, the government and Probation advocated for and the Court accepted the following loss calculation: the total contributions to the Fund ($87,908,048.37) minus distributions the Fund made to investors ($39,343,725.37) equaled $50,327,484.04.[1] Now, on remand, the Ninth Circuit directs us to offset a victim's loss by a victim's benefit. This is accomplished, according to the Ninth Circuit, by determining the actual value, if any, of the Fund, and to deduct that value from the loss amount. *United States v. Geringer*, 672 Fed.Appx. 651 (9th Cir. 2016). Therefore, we must now turn to the value of the assets in the Fund on a particular measurement date.

Application Note 3(E)(i) to USSG § 2B1.1 provides guidance on selecting a measurement date. According to this Note, loss is reduced by money returned and the fair market value of property returned by the defendant to the victims before the offense was detected. This Court held a multiday evidentiary hearing to determine the value of DDNI, the Fund's largest remaining asset. Dkt. 329, 330, 331, and 348. The government called a former DDNI employee to testify, and the government and the defendant each called an expert witness. While the experts disagreed about most subjects, they both accepted May 23, 2012 as the appropriate measurement date. Thus, we now turn to determining the value of the Fund's assets on May 23, 2012.

The Fund had three assets on May 23, 2012:

(1) 55% equity ownership interest in DDNI;

(2) The assets of The MediaTile Company; and

(3) Cash

First, the Fund's interest in DDNI, was the subject of a four-day evidentiary hearing. The parties produced expert reports, the Court heard expert testimony, and the Court heard testimony from a former DDNI employee. On November 15, 2018, the Court heard final arguments from the parties, and

---

[1] *See* Dkt. 162 for a more detailed analysis of the $50.3M loss number. Put simply, the government calculated the GLR loss from the beginning of the Fund through 5/1/09 ("time period one"), and the GLR loss from 5/1/09 to the end of the fraud scheme in 2012 ("time period two"). While Luck and Rode were held responsible for time period two losses, Geringer's loss amount was calculated by adding together time periods one and two. The loss amount for time period one is $17,446,672.22. The loss amount for time period two is $32,880,811.82. Therefore, Geringer's total loss amount is $50,327,484.04.

RE-SENTENCING MEMORANDUM
12-00888 EJD                                              4

determined that DDNI had a value on the measurement date of not greater than $1 million. Tr. 11/15/2018 at 68. If we assume a value, therefore, of $1 million, GLR's 55% equity stake in DDNI would amount to $550,000. Dkt. 332 at Defense Exhibit 87.

Second, we can easily approximate the value of The MediaTile Company on the measurement date. On August 28, 2012, this Court entered an Order Modifying Asset Freeze concerning the Fund's account at Santa Cruz County Bank ending in 0522. Dkt. 36 of 12-CV-02663-EJD. This Order allowed $786,354.80 to be deposited into the account following the sale of substantially all of the assets of MediaTile. Dkt. 78 of 12.CV-02663-EJD. Therefore, a reasonable approximation of MediaTile's value on May 23, 2012 is its sales price of $786,354.80 in August 2012.

Third, we can determine the amount of the Fund's cash on the measurement date. As of June 12, 2012, the date the Court entered the Order Granting Preliminary Injunction and Ancillary Relief (Dkt. 15 in 12-CV-02663-EJD), the Fund's Santa Cruz County Bank account ending -0522 had a balance of $851.18.

Therefore, the defendant is entitled to a credit against loss in the amount of $550,000 + $786,354.80 + $851.18, or $1,337,205.98. If we credit this amount against the previous loss amount $50,327,484.04, the defendant's new, adjusted loss number is $48,990,278.06. Finally, there was an arithmetic error in the original loss calculation. Correcting for this mistake, the actual loss number is now $48,810,644.99.

## IV. GUIDELINES CALCULATION

Pursuant to the United States Sentencing Guidelines, which are advisory after the Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738 (2005), the defendant has a total offense level of 32. [*Compare with* Draft PSR[2] ¶ 56 without 5K adjustment.] The defendant's base offense level is 7. [U.S.S.G. §2B1.1 and PSR ¶ 47.] The base offense level is increased by twenty-two (22) levels, to 29, due to the amount of loss involved in the offense. [U.S.S.G. § 2B1.1(b)(1)(L) and PSR ¶ 47.]

---

[2] The government is filing this memorandum before the Final PSR is released. We will update the Court at sentencing should the Final PSR necessitate that.

RE-SENTENCING MEMORANDUM
12-00888 EJD                                5

Pursuant to U.S.S.G. § 2B1.1(b)(2)(B), the offense level is increased by four levels due to the number of victims, namely 132 victim-investor groups (investor groups count a multiple member family of investors as single investor group), harmed by this scheme. [PSR ¶ 47.]

Under § 2B1.1(b)(19)(A)(ii), if the offense involved a violation of securities law and the defendant was an investment advisor or a person associated with an investment advisor, the defendant's offense level is increased by four levels. [PSR ¶ 47.] Therefore, the defendant's offense level, before acceptance, is 37. [PSR ¶ 52.]

The defendant has demonstrated an acceptance of responsibility for his crimes, and, therefore, he is entitled to a three point reduction for acceptance of responsibility pursuant to § 3E1.1, resulting in a total offense level of 34. [PSR ¶ 56.]

The government and the Probation Officer calculate that the defendant has zero criminal history points, and therefore, falls into Criminal History Category I. [PSR ¶ 55.] Total offense level 34 indexed with a Criminal History Category of I yields a guideline range of 151 – 188 months imprisonment. The government believes that the defendant is entitled to a two-level reduction for substantial assistance under U.S.S.G. § 5K1.1. After that departure, the defendant's total offense level is 32, and his applicable guideline range is 121 – 151 months imprisonment. The government believes that a sentence of 145 months imprisonment, a sentence at the midrange, is reasonable and appropriate for the reasons discussed below. Before turning to a reasonable sentence, a brief discussion of the applicable USSG enhancements follows.

A.  **Loss Calculation**

The amount of loss for which Geringer is responsible is $48,810,644.99.[3] The applicable United States Sentencing Guideline for calculating the amount of loss caused by this fraud is U.S.S.G. § 2B1.1. This Guideline requires that the Court "make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt.

---

[3] At John Gerninger's initial sentencing hearing, the government provided to the Court a binder that contained the supporting documentation for the loss figure. The government provided this documentation to the defense in discovery in the underlying case. The government will again bring a copy of this binder to the sentencing hearing.

RE-SENTENCING MEMORANDUM
12-00888 EJD                                           6

n.3(C). "Actual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense," meaning monetary harm "that the defendant knew or, under the circumstances, reasonably should have known was a potential result of the offense." *United States v. Treadwell*, 593 F.3d 990, 1003 (9th Cir. 2010). For losses resulting from an extensive fraudulent conspiracy, including a lengthy Ponzi scheme, U.S.S.G. § 1B1.3, in the context of calculating the amount of loss under § 2B1.1, requires the district court to make factual determinations establishing the scope of each defendant's joint undertaking and the amount of losses reasonably foreseeable to each defendant. *Id.; see also United States v. Riley,* 335 F.3d 919, 928 (9th Cir. 2003).

In the present case, $48,810,644.99 represents the total of investments made by investors during the Growth Fund, offset by any money or property returned to those investors before discovery of this fraud. Geringer, as acknowledged by: (1) his guilty plea, (2) evidence obtained during the investigation of this fraud, and (3) statements in the PSR, knowingly made false and misleading statements to investors in order to encourage them to invest. Geringer prepared the GLR investment materials, and was present for and even participated in new investor recruitment pitches. Geringer knew that GLR investors sought a diversified investment opportunity. Geringer was involved in both sides of the fraud (investor recruitment as well as misspending of the investor money). Geringer knew that GLR no longer provided a diversified investment opportunity to its investors, but represented to investors that it did. Geringer also knew that unless Luck and he continued to misrepresent this "diversification myth" to new investors, these investors would be less likely to invest in GLR. Geringer also knew that if he failed to recruit new investors, and then divert their investment monies into the private company, DDNI, the scheme would collapse. Geringer knew that GLR's continued operation and solvency hinged on his ability, and Luck's ability, to continue to recruit new investors.

**B.    Number of Victims**

One hundred and thirty-two investor-groups invested money into the GLR Growth Fund. "Investor-groups" counts multiple investors from the same family as a single investor-group. Defrauding one hundred and thirty-two victims places Geringer comfortably within the range for the

RE-SENTENCING MEMORANDUM
12-00888 EJD                                        7

four-point enhancement for number of victims under § 2B1.1(b)(2)(B). In fact, Geringer has defrauded many more victims than are required (50) to justify the four-level enhancement. In other words, there is no accompanying increase in Geringer's Sentencing Guidelines for nearly eighty of his victims. For this reason, and other discussed below, a reasonable sentence for Geringer is within his new applicable Guidelines range (121 – 151 months).

### C. Violation of Securities Laws

Under § 2B1.1(b)(19), the defendant's offense level is increased by four levels, since the offense involved a violation of securities laws and, at the time of the offense, the defendant was either a registered broker dealer or investment advisor or a person associated with either a registered broker dealer or investment advisor. The defendant agreed to this enhancement in his plea agreement.

### D. Substantial Assistance

This defendant was the first defendant in this case to plead guilty. Even before he entered a guilty plea, the defendant expressed a desire to change his plea, and this fact was known by his co-defendants. As a result of his cooperation and proffers with the government, this defendant's change of plea contributed to the decisions by each of his co-defendants to enter guilty pleas. For instance, before indictment, this defendant participated in a proffer with government. The reports from this proffer, along with this defendant's prior FBI interviews, were provided to Luck and Rode shortly after indictment. Geringer pled guilty on June 4, 2014. A little over a month later, on July 21, 2014, Luck pled guilty. Then, on December 15, 2014, Rode pled guilty. When they decided to plead guilty, both Luck and Rode knew that Geringer had already pled and implicated them in the fraud conspiracy. Luck and Rode also knew that if they took the matter to trial, Geringer was prepared to testify against them. Therefore, Geringer provided substantial assistance to the government in this matter, and deserves a two-level reduction in the applicable Sentencing Guidelines pursuant to Section 5K.

## V. SENTENCING RECOMMENDATION

The United States recommends a sentence of 145 months' imprisonment, followed by a three-year term of Supervised Release. The United States also recommends that the Court order the defendant

RE-SENTENCING MEMORANDUM
12-00888 EJD                                8

to pay restitution in the amount of $50,327,484.04 less any payments already received by the victims. These payments should be ordered payable to the specified victims (previously provided to the Court under separate cover), and the $300 special assessment. Finally, the Court should enter a judgment against the defendant in the amount of $50,327,484.04.

### A.     3553(a) Factors

The statute that governs imposition of sentence, 18 U.S.C. § 3553(a), sets forth factors this Court must consider in crafting a sentence that is "sufficient, but not greater than necessary" to comply with the objectives of sentencing. First, a sentencing court must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(1) and (2)(A). Here, a 145-month sentence would punish the defendant justly and adequately for his serious criminal conduct. Instead of being a diversified investment opportunity, the GLR Growth Fund became an investment fraud scheme, and Geringer is most responsible for this result. At its most basic level, the Growth Fund took investor money in, and spent investor money. Geringer was responsible at both ends. Since Geringer recruited investors, he knew what promises and representations were being made to investors in order to get them to invest. Since Geringer knew how the Growth Fund money was being spent, he also knew that these promises and representations he was making to investors were false. In meeting with the investors, Geringer learned that a diversified investment opportunity was crucial to convincing Growth Fund investors to invest with GLR. Unfortunately, when the few equity trades Geringer made failed to return the significant profits he had promised, Geringer fabricated trading records. Geringer used these fabricated trading records to justify deceiving even more investors. This cycle of deception, begun exclusively through Geringer's conduct, snowballed until scores of victims lost millions of dollars.

The harm caused by this fraud was devastating to victims. The financial loss suffered by these victims harmed each in unique ways. Some victims were forced delay or abandon retirement and return to work, having lost what they expected would be their retirement savings. This scheme forced other

victims to sell their homes, and move to parts of the country with lower costs of living. Still other victims suffered, and continue to suffer, mental and emotion anguish as a result of their victimization.

The defense asks for a downward variance from the Guidelines range, based in part on his long life before criminal conduct. While his lack of criminal history is true and commendable, it is sufficiently accounted for by his Criminal History Category. Moreover, the government believes that no mitigating factor is present in Geringer's case to an extent beyond the ordinary heartland of these types of cases.

### B.     Restitution

The United States also recommends that the Court order the defendant to pay restitution in the amount of $50,327,484.04 made payable to specified victims (previously provided to the Court under separate cover). Geringer should be held jointly and severally liable for a portion of this restitution, specifically $32,823,148.82, with his co-defendants. It is proper to hold Geringer responsible for restitution for all losses resulting from any conduct that was part of the scheme. *United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir. 1996) ("[W]hen someone is convicted of a crime that includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, the court can order restitution for losses resulting from any conduct that was part of the scheme, conspiracy, or pattern of criminal activity."); *see also United States v. Brock-Davis*, 504 F.3d 991, 998-99 (9th Cir. 2007).

### C.     Forfeiture

Finally, as discussed above, the Court should order that the defendant's sentence include a money judgment. As described in 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Court can now determine the amount of money that the defendant will be ordered to pay. The Court must find this amount by a preponderance of the evidence. *United States v. Garcia-Guizar*, 160 F.3d 511, 517-18 (9th Cir. 1998). Since there is no dispute that during the relevant time period, investors invested $50,327,484.04 (the total amount offset by money returned), the Court should adopt this figure as the forfeiture amount. Federal Rule of Criminal Procedure 32.2(b)(4) says that the forfeiture *must* be included in the oral announcement of the sentence and included in the judgment. *See United States v. Shakur*, 691 F.3d 979, 988-89 (8th Cir. 2012); *United States v. Ferguson*, 385 F. App'x 518, 530 (6th

Cir. 2010); *United States v. Petrie*, 302 F.3d 1280, 1284 (11th Cir. 2002).

Forfeiture and restitution are distinct, and the defendant is not entitled to an offset against a restitution order to reflect the amount forfeited, or vice versa. *United States v. Newman*, 659 F.3d 1235, 1241-43, 1244 (9th Cir. 2011); *United States v. Pescatore*, 637 F.3d 128, 137 (2d Cir. 2011). Moreover, forfeiture is not a ground for reducing the defendant's period of incarceration. *United States v. Milo*, 506 F.3d 71, 74 (1st Cir. 2007); *United States v. Cacho-Bonilla*, 404 F.3d 84, 92 (1st Cir. 2005); *United States v. Bright*, 353 F.3d 1114, 1119 (9th Cir. 2004).

The amount of the present forfeiture money judgment is unaffected by the decision in *Honeycutt v United States*, __ U.S. __, 137 S.Ct. 1626 (2017). *Honeycutt* addressed the illegal sales of a product at an otherwise legitimate hardware store. *Id.* at 1630. The Court declined to hold a minor co-conspirator responsible for the proceeds of the entire conspiracy when that conspirator only managed the store, was a salaried employee with no ownership interest in the store, and never "obtained" or "personally benefited" from any of the tainted proceeds of the conspiracy. *Id.* at 1632-33, 35. While *Honeycutt* limited a conspiracy's incidental figures from monetary liability far beyond their roles, it expressly did not minimize the liability of those at the center of a conspiracy. "In all instances," one who masterminds a conspiracy "ultimately 'obtains' the property – whether 'directly or indirectly'" and is liable for all proceeds. *Id.* at 1633.

Several lower courts have recognized this distinction in *Honeycutt*. Picking up on the distinction,

> [L]ower courts have declined to apply *Honeycutt* in cases where the defendant held a position of control in the criminal enterprise. *See, e.g., S.E.C. v. Metter*, 706 Fed App'x 699, 702 n.2 (2d Cir. 2017) (declining to apply *Honeycutt* to a defendant who controlled the enterprise at issue in part because *Honeycutt* only 'protects incidental figures from forfeiture of amounts far beyond what would be justified by their role in the offense'); *United States v. Ward*, 2017 WL 4051753, at *3 (W.D. Mich. Aug 24, 2017), report and recommendation adopted, No. 2:16-CR-06-01, 2017 WL 3981160 (W.D. Mich. Sept. 11, 2017) (declining to apply *Honeycutt* because 'Defendant is closely akin to the hypothetical . . . mastermind described in *Honeycutt*.').

*United States v. Bangiyev*, __ F.Supp.3d __, 2019 WL 645050, at *4 (E.D.Va. Feb. 14, 2019). In *Bangiyev*, the court held the two defendants before it were in the same position as the hypothetical mastermind in *Honeycutt* as they resided at the center of a large, sophisticated conspiracy for years and

RE-SENTENCING MEMORANDUM
12-00888 EJD                                    11

had made up to $20 million dollars each. *Id.*

In this case, Geringer was the mastermind at the center of a conspiracy. He created the investment fund, and converted it into an investment fraud scheme. He was the principal fraudster, and Luck and Rode joined him after he had been running the fraud alone for several years. His participation in the fraud continued until the fraud's end. He actively recruited investors, fabricated trading records, and made knowingly false statements to investors designed to entice these investors to invest or to remain investors. Finally, he obtained the proceeds throughout the entire conspiracy, then personally directed where investor funds would be spent and personally benefited from the distribution of these funds.[4]

Therefore, the Court should enter a judgment against the defendant Geringer personally in the amount of $50,327,484.04.

Dated: April 1, 2019

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

/s/
JEFF SCHENK
Assistant United States Attorney

---

[4] Because this defendant squarely fails to merit the limited liability identified in *Honeycutt*, the government does not address (but does not waive) other issues raised in *Bangiyev* and other cases relating to the *Honeycutt* opinion, such as its retroactivity and its application to other statutes.

RE-SENTENCING MEMORANDUM
12-00888 EJD            12